## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE A. SU,<br>Acting Secretary of Labor, United States<br>Department of Labor,<br><br>                 Plaintiff,<br><br>v.<br><br>RIVERSEDGE ADVANCED RETIREMENT<br>SOLUTIONS, LLC., a Pennsylvania<br>Company, PAUL PALGUTA, an individual,<br><br>v.<br><br>MID ATLANTIC TRUST COMPANY dba<br>AMERICAN TRUST CUSTODY, a<br>corporation, SCHWAB RETIREMENT<br>TECHNOLOGIES, INC., a corporation, and<br>CHARLES SCHWAB TRUST BANK, a<br>corporation, *solely as Rule 19 defendants*,<br><br>                 Defendants. | Civil Action Case No. 2:24-cv-104<br><br>**MEMORANDUM IN SUPPORT OF ACTING SECRETARY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR AN ORDER FOR DEFENDANTS TO SHOW CAUSE WHY THIS COURT SHOULD NOT ENTER A PRELIMINARY INJUNCTION** |

The Acting Secretary of Labor ("the Acting Secretary") moves this Court to issue a temporary restraining order to protect ERISA plan assets from theft and misappropriation. In support thereof, the Acting Secretary states as follows:

Multiple ERISA plans will suffer irreparable harm unless this Court enters a temporary restraining order against RiversEdge Advanced Retirement Solutions, LLC ("RiversEdge") and its owner and manager, Paul Palguta ("Palguta") (collectively "Defendants"). These Defendants misappropriated millions in plan assets while acting as third-party administrators to hundreds of retirement plans, most of which are covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* These Defendants illegally transferred employees' retirement plan assets from some plans' accounts into the accounts of totally unrelated plans while

1

simultaneously embezzling millions in plan assets to RiversEdge's corporate account. These Defendants then sent fraudulent statements to ERISA plans indicating that the plan assets were still in their trust accounts when, in fact, they had been transferred elsewhere.

This Court must restrain Palguta and RiversEdge from continuing their embezzlement and misappropriation of plan assets. At least $8 million in plan assets may be missing and unrecoverable. This Court should "stop the bleeding" by enjoining these Defendants from exerting control over any ERISA plan assets now and in the future. The records of the plans must be secured, as well. In addition, many plans understandably want to withdraw their account balances, which, in many cases, now contain the assets of other retirement plans, which understandably need to have an immediate accounting of their retirement benefits, which may now be underfunded. An immediate freeze on the account of RiversEdge is needed to stop further dissipation of plan assets. An independent fiduciary is needed to secure plan records and conduct an accounting to prevent additional irreparable harm to the ERISA plans.  The independent fiduciary must audit seventeen (17) identified plans which had suspicious transactions and replace Palguta and RiversEdge as fiduciaries to RiversEdge's own 401(k) Profit Sharing Plan.

**FACTUAL BACKGROUND**

**I.        Defendants Have Access to Millions of Dollars in ERISA Plan Assets.**

RiversEdge is actively serving as a third-party administrator[1] for at least 240 retirement plans holding millions of dollars in plan assets. Many of these plans are covered by the

---

[1] A third-party administrator of a retirement plan is an agent authorized by a plan to manage and administer plan assets, such as distributing funds to retirees.

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* [2] MATC, a corporation, serves as an asset custodian for RiversEdge's clients by holding the plan assets for various retirement plans in trust accounts, subject to the direction of the plan sponsor and RiversEdge as the plan sponsor's agent. A sample custodial agreement was provided to EBSA investigator James Moran, whose affidavit is attached as Exhibit 1. The custodial agreement is attached to Moran's Affidavit as Exhibit 1-C. Charles Schwab Trust Bank, a corporation, also serves as an asset custodian by holding the plan assets for other retirement plans in trust accounts, and Schwab Retirement Technologies, Inc. is a software licensor and data hosting provider (collectively "Schwab"). RiversEdge also is the sponsor of its own retirement plan, The RiversEdge 401(k) Profit Sharing Plan.  RiversEdge and Palguta are fiduciaries to this plan.

As an asset custodian, Mid Atlantic Trust Company ("MATC") provides "custodial, cashiering, and tax reporting services" to many of these ERISA-covered and non-ERISA covered retirement plans.[3] *See* Affidavit of Michele Coletti, President of Custody and Trading Solutions, AmericanTCS Holdings, LLC, the direct parent company of MATC, attached hereto as Exhibit 2.

MATC entered into separate contracts with each of those ERISA plans, and each contract "appoints RiversEdge as agent for the plan, authorizing MATC to take all trade, cash activity, and tax reporting instructions from RiversEdge." *Id*. The plans also entered Retirement Plan Services Agreements with RiversEdge. *See* Exhibits 1 and 1-C. Multiple people at RiversEdge, including but not limited to Paul Palguta, have authority to execute trades on those accounts Exhibit 2.

---

[2] In this Motion, the Acting Secretary refers to retirement plans covered by ERISA as "ERISA plans" and plans not covered by ERISA as "non-ERISA plans."
[3] In this Motion, the Acting Secretary refers to retirement plans covered by ERISA as "ERISA plans" and plans not covered by ERISA as "non-ERISA plans." Collectively, they are referred to as "plans" or "retirement plans."

RiversEdge also established a "corporate paying agent account" with MATC. This account is a book entry account held under account #RERREBTE." *Id.* The #RERREBTE account is "a corporate custody account." According to MATC, the account "can only hold cash awaiting further disbursement instructions as entered by RiversEdge personnel." Exhibit 2. Since at least June 2017, all wire, check, and ACH payments initiated from the RiversEdge account have been sent solely to an account at PNC Bank for FBO RiversEdge Advanced Retirement Solutions. *Id.*

## II. Defendants Misappropriated Millions in ERISA Plan Assets.

### A. Defendants Shuffled ERISA Plan Assets Among Unrelated Trust Accounts.

On or about October 27, 2023, Paul Palguta placed an order ("the Order") to buy shares for a non-ERISA plan called the Beaver County Deferred Compensation Plan. However, the plan did not have sufficient cash available to complete the Order. Exhibit 2. MATC contacted Palguta about the insufficient cash, and Palguta stated that RiversEdge would correct the problem. *Id*. On or about November 14, 2023, Palguta notified MATC that he had corrected the problem. MATC confirmed that the Beaver County Plan had the cash needed to complete the order, but determined the cash needed to complete the order had been transferred that day to the Beaver County Plan directly from RiversEdge's account, #RERREBTE, in a transaction that Palguta initiated on November 13, 2023. *Id.*

The assets to complete the Order had apparently been misappropriated from six plans, four of which were ERISA plans. MATC found that on November 13, 2023, Defendants[4] had transferred assets from six unrelated plan accounts into #RERREBTE, as follows:

---

[4] The transactions were affected using both Paul Palguta and Jennifer Palguta's user IDs, but, as explained later, Jennifer Palguta has not worked for RiversEdge for many years.

a. $167,452.00 from Christian Aid Mission 403(b) Plan, a non-ERISA plan;

b. $539,682.00 from LCBC Church 403(b) Plan, a non-ERISA plan;

c. $126,967.00 from Elite Mechanical, Inc, 401(k) Profit Sharing Plan, an ERISA plan;

d. $210,637.00 from Hawaiian Island Dental, Inc. 401(k) Plan, an ERISA plan;

e. $223,123. Hampton Technical Associates, Inc. 401(k) Profit Sharing Plan, an ERISA Plan; and

f. $413,955.00 from The National Fruit Product Co., Inc. 401(k) Profit Sharing Plan, an ERISA plan.

*Id.* In sum, these transfers resulted in a transfer of $1,681,816.00 from these plans to the #RERREBTE account. Palguta then transferred almost the same amount, $1,679,086.74, from the #RERREBTE account into the Beaver County Plan to fulfill the Order. *Id.*

This suspicious transfer of plan assets prompted MATC to begin an audit of RiversEdge's accounts. *Id.* This audit revealed that RiversEdge's #RERREBTE account had not received any outside cash since at least 2017; all cash deposits were from plan accounts. *Id.* MATC also found many instances of reverse flow of cash, in which Defendants transferred cash from #RERREBTE into plan accounts. *Id.* RiversEdge was transferring cash from one plan trust account to another, running the funds through the #RERREBTE account. MATC's internal audit found seventeen (17) plans have experienced suspicious transactions including RiversEdge's own 401(k) Profit Sharing Plan. *Id.*

B.      <u>Defendants Reported More Assets to the Government Than Were in the MATC Accounts.</u>

A Form 5500 is a document that certain ERISA plans must file annually with the U.S. Department of Labor to report information about the plan, including the amount of the plan's assets. Many of the Form 5500s prepared by RiversEdge overstated the assets that the plans held at MATC by approximately the same amounts that were involved in transactions initiated by

Palguta and involving the #RERREBTE account. *Id.* Palguta told EBSA's investigator that none of the plans with custodial accounts at MATC held funds anywhere else. Exhibit 1-B. Therefore, the account balances should have conformed to the amounts reported to the government on the Form 5500s. They do not; assets are missing, as described below:

      1.      *Family Medicine of Albemarle ERISA Plan has at Least $569,798.00 in Unaccounted for Plan ERISA Plan Assets.*

Family Medicine of Albemarle 401(k) Plan, an ERISA Plan, has a deficiency of $591,269.00 when its 2022 Form 5500 reported balance is compared to its MATC account balance. In that plan year, Defendants transferred $569,798 from that plan's account to the RiversEdge account, #RERREBTE. *Id.*

      2.      *The Hawaiian Island Dental, Inc. 401(k) Plan has at Least $735,177 in Unaccounted for Assets.*

Hawaiian Island Dental, Inc. 401(k) Plan has a deficiency of $735,177 when its Form 5500 reported balance for 2022 is compared to the account value from the MATC statement. That year, RiversEdge made three transfers out of the nine transfers out of the Hawaiian Islands Dental, Inc. 401(k) Plan account to RiversEdge's account, #RERREBTE, totaling $714,265.00. *Id.*

      3.      *The Hampton Technical Associates ERISA Plan has at Least $749,358 in Unaccounted for Assets.*

Hampton Technical Associates 401(k) Profit Sharing Plan, an ERISA Plan, has a deficiency of $752,576 when its Form 5500 reported balance for 2022 is compared to the account value from the MATC statement. That year, RiversEdge made nine transfers out of the Hampton Technical Associates 401(k) Profit Sharing Plan account to RiversEdge's account, #RERREBTE, totaling $749,358.00. *Id.*

4. *The W.N. Tuscano Agency ERISA Plan has at least $2,334,278 in Unaccounted Assets for Plan Year 2021 and $2,425,204 in Unaccounted Assets for Plan Year 2022.*

RiversEdge made certain transactions into and out of the W.N. Tuscano 401(k) Plan in 2021 and 2022 that correlate almost exactly with the deficiency between the assets reported on its Form 5500 and the assets actually in its MATC custodial account for those years. Exhibit 2. The transactions are described below:

1. The 2021 Form 5500 exceeded the MATC statement by $2,334,278.

2. In 2021, three transactions were posted by RiversEdge for a total of $2,274,699 from the plan account to RiversEdge's #RERREBTE account, which is close to the $2,334,278 overstatement of assets on the 2021 Form 5500.

3. The 2022 Form 5500 exceeded the MATC statement by $2,425,204.

4. In 2022, RiversEdge made three transfers from the plan account to #RERREBTE totaling $1,032,807 and one transfer from #RERREBTE back to the plan account, for a net transfer out of the plan account of $116,633.

When combined with the 2021 transfers out, the net transfers out for the two-year period ending December 31, 2022 was $2,391,332, which is close to the $2,425,204 overstatement of assets on the 2022 Form 5500. *Id.*

C. RiversEdge's Clients' Accounts Were Short of Funds.

The RiversEdge statements for the W.N. Tuscano plan described above showed a deficiency of more than $5 million by March 2023. Affidavit of Susan Crary, Vice President of Finance for W.N. Tuscano, attached as Exhibit 3. From April 1, 2013 through December 1, 2023, the plan used RiversEdge as its third-party administrator. *Id.* During this period, MATC was the plan's sole asset custodian. *Id.* MATC held the plan assets in a trust account and provided quarterly statements to the plan showing the account balances. RiversEdge also provided

quarterly statements showing the account balances. Comparing the MATC statements with the RiversEdge statements, fiduciary Susan Crary noticed that there were fewer assets shown on the MATC statement than the RiversEdge statement; more than $5 million was missing from the MATC account. *Id*. Crary identified multiple transfers of plan assets into RiversEdge account #RERREBTE. Specifically:

a.    On June 30, 2021, $1,294.,935.00 was transferred out of the Plan to #RERREBTE.

b.    On September 30, 2021, $453,892.50 was transferred out of the Plan to #RERREBTE.

c.    On December 30, 2021, $525,872.00 was transferred out of the Plan to #RERREBTE.

d.    On June 30, 2022, $312,457.35 was transferred out of the Plan to #RERREBTE.

e.    On September 30, 2022, $266,457.35 was transferred out of the Plan to #RERREBTE.

f.    On October 12, 2022, $453,892.50 was transferred out of the Plan to #RERREBTE.

g.    On November 14, 2022, $916,174.08 was transferred into the Plan from #RERREBTE.

h.    On January 3, 2023, $1,349,712.00 was transferred out of the Plan to #RERREBTE.

i.    On March 31, 2023, $1,130,467.20 was transferred out of the Plan to #RERREBTE.

*Id*. When Crary asked Palguta repeatedly to explain the missing $5 million, Palguta replied that it was due to a "system trading error" and would be corrected. *Id*. When Tuscano terminated its relationship with RiversEdge, Palguta finally returned the $5 million. The source of that $5 million was transfers of money from several other unrelated plans.

In addition, Randall Jaurequi, the owner of Hawaiian Island Dental and a Trustee for the Hawaiian Dental, Inc. 401(k) Plan, stated that $1,736,877.47 had been removed from the Plan's trust account. Exhibit 4, Affidavit of Randall Jaurequi. Specifically:

a. On September 30, 2022, $138,555.65 was transferred out of the plan to #RERREBTE;

b. On October 6, 2022, $317,688.40 was transferred out of the plan to #RERREBTE;

c. On November 14, 2022, $258,021.52 was transferred out of the plan to #RERREBTE;

d. On January 3, 2023, $193,555.65 was transferred out of the plan to #RERREBTE;

e. On October 10, 2023, $470,452.00 was transferred out of the plan to #RERREBTE;

f. On October 12, 2023, $147,967.25 was transferred out of the plan to #RERREBTE;

g. On November 14, 2023, $210,637.00 was transferred out of the plan to #RERREBTE.

*Id.*

### III. Defendants Have Accelerated Their Embezzlement Since November 2023.

A. <u>Defendants Have Embezzled at Least $1,812,487.77 Since November 2023.</u>

From November 30, 2023, through January 4, 2024, RiversEdge and Palguta transferred $1,812,487.77 from their account at #RERREBTE to the account at PNC Bank. Exhibit 1. The transactions were structured so as to avoid the MATC review of transactions over $25,000. For example, on November 22, 2023, Paul Palguta initiated two fed wires to the RiversEdge corporate account at PNC: $24,756 and $23,975. On the same day, Jennifer Palguta entered a wire to the PNC account in the amount of $23,250. Jennifer approved and released Paul's two wire requests. Paul approved Jennifer's wire request. Had they entered a single wire request of

9

$71,981, the transfer would have been pended for MATC's review and approval. However, by structuring transactions to remain under the $25,000 threshold, the transaction remained solely under the control of RiversEdge. Exhibit 2. The MATC audit determined that all transactions out of the account to PNC Bank were associated with the login IDs of either Paul or Jennifer Palguta. *Id.* Paul Palguta stated to DOL investigators that his wife, Jennifer Palguta had not worked for RiversEdge for over six years.  It is unknown who was using his wife's ID number to initiate and approve transactions.

From November 30, 2023 through January 4, 2024, Defendants have accelerated their transfers of plan assets between various trusts and to a RiversEdge account, continuing to run these plan assets through its #RERREBTE accounts. Transfers into the #RERREBTE that during this period total $2,362,118.05. Specifically:

a. $93,248.00 was transferred from the ERISA plan, Hampton Technical Associates 401(k) Profit Sharing Plan;

b. $90,655.85 was transferred from the ERISA plan, Elite Mechanical, Inc. 401(k) Profit Sharing Plan;

c. $217,466.00 was transferred from the ERISA plan, The National Fruit Product Co., Inc. 401(k) Employee Savings Plan;

d. $1,494,969.20 was transferred from the non-ERISA plan, LCBC Church; and

e. $465,769.00 was transferred from the non-ERISA plan, Beaver County.

Exhibit 2.[5]

---

[5] During the same time period, Defendants also transferred $556,168.43 from the RiversEdge #RERREBTE to the ERISA plan of Max Environmental Technologies, Inc.; and $32,173.39 to the ERISA plan of W.N. Tuscano Agency, Inc. Exhibit 2.

During the same time period, Defendants transferred $1,812,487.77 from #RERREBTE to a RiversEdge bank account at PNC Bank through a series of transactions seemingly structured to evade MATC's review. During this period, RiversEdge made 84 separate transfers of less than $25,000. On December 27, 2023 alone, RiversEdge initiated 14 separate transfers totaling $308,306.70. *Id*.  On or about January 2, 2024, PNC's statements show that Palguta transferred more than $185,000 from PNC to himself in the form of cash ATM withdrawals or ACH transfers. Exhibit 1.

B.    <u>Defendants Have Attempted to Create Fraudulent User IDs for Their MATC Account.</u>

On or about January 3, 2024, someone at RiversEdge attempted to change the user ID associated with Jennifer Palguta for its MATC account to "John Palguta." Paul Palguta told MATC that the change was made in error and the name associated with the account should remain "Jennifer Palguta." Exhibit 2. But as set forth above, Paul Palguta stated to DOL investigators that his wife had not worked for RiversEdge for at least the past six years. Exhibit 1-B. On or about January 10, 2024, someone at RiversEdge made multiple attempts to reactivate the user ID of a former employee of RiversEdge. The attempts failed as the person attempting to reactivate the account did not have the requisite information to unlock the password. Exhibit 2. Due to these attempts to circumvent their security  and access accounts, MATC removed RiversEdge's access to MATC's system for all of RiversEdge's clients on or about January 10, 2023. *Id*.

C.    <u>The U.S. Department of Labor's Investigation Uncovered Further Improprieties.</u>

The U.S. Department of Labor's Employee Benefits Security Administration ("EBSA") investigated these issues. Reviewing the #RERREBTE ledgers, EBSA determined that

RiversEdge and Palguta had transferred a total of at least $5.5 million from that account to PNC Bank. Exhibit 1.

EBSA contacted at least four of the clients that MATC had identified and verified that all of their funds were at MATC, rather than at some other benefits custodian. *Id.* Therefore, the amount shown on the account statements that RiversEdge provided to these clients should have been the same as the amount of assets held in the trust accounts at MATC. But they were not the same. There were less plan assets in the trust accounts than shown on the RiversEdge statements. *Id.*

On January 11, 2024, the U.S. Department of Justice issued preservation letters to MATC and PNC asking them to freeze RiversEdge's accounts because they likely contained proceeds of a crime. DOJ has not stated to DOL whether they have obtain a court warrant to freeze the accounts.

IV.    **Defendants May Be Engaging in Further Violations Regarding ERISA Plan Assets in Schwab's Custodial Accounts.**

EBSA found that RiversEdge also services plans that have assets held at Schwab on a custodial basis. Exhibit 1. EBSA has not been able to determine whether Schwab has terminated RiversEdge's or Palguta's access to these accounts. EBSA has not been able to determine the number of RiversEdge clients that use Schwab as their asset custodian, the number of these that are ERISA plans, whether RiversEdge made any illegal transfers of the plans' assets, or whether funds are missing from those plans' accounts. Therefore, Palguta or RiversEdge may still have access to these accounts.

**ARGUMENT**

**I.        ERISA Authorizes This Court To Award Injunctive Relief.**

A.        ERISA Explicitly Authorizes Injunctive Relief.

ERISA is a comprehensive and remedial statute designed to promote and protect the interests of participants and their beneficiaries in employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S 359, 361-62 (1980). Courts have repeatedly found that, under ERISA's broad remedial provisions, injunctive relief, such as that sought in this action, is appropriate. *See, e.g., Donovan v. Mazzola*, 716 F.2d 1226, 1238-39 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984). In passing ERISA, Congress declared a national public interest in protecting "the continued well-being and security of millions of employees and their dependents . . . directly affected by these plans." ERISA § 2(a), 29 U.S.C. § 1001(a); *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009); *Herman v. South Carolina Nat'l Bank,* 140 F.3d 1413, 1423 (11th Cir. 1998). In furtherance of this goal, "Congress intended to make available the full range of legal and equitable remedies in cases of ERISA violations." *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1306 (E.D.N.Y. 1988) (citing HS.Rep. No. 93-127H, reprinted in 3 U.S. Code Cong. & Admin.News 4639, 4838, 4871 (1974)); *accord South Carolina Nat'l Bank*, 140 F.3d at 1423 ("It remains the intent of Congress that the courts use their power to fashion legal and equitable remedies that not only protect participants and beneficiaries but deter violations of the law as well").

The Acting Secretary's enforcement action under ERISA is aimed not only at recovering losses on behalf of plan participants, but also at "deterring future losses by ERISA plans, assuring uniform compliance with fiduciary obligations, and maintaining public confidence and

integrity in the financial wellbeing of the pension system." *Chao v. Chermak*, No. 1:05CV1935, 2006 WL 3751191, at \*2 (N.D. Ohio Dec. 18, 2006).

The instant action and Motion fall squarely within ERISA's statutory charge to the Acting Secretary and are in furtherance of the Acting Secretary's goal of protecting the participants and beneficiaries of the employee benefit plans subject to this action. In addition to providing for the removal of existing plan fiduciaries, such relief also includes the appointment of an independent fiduciary to carry out the proper administration and management of benefit plans. *Mazzola*, 716 F.2d at 1238-39; *Solis v. Vigilance, Inc.*, No. C-08-05083, 2009 WL 2031767, at \*3 (N.D. Cal. July 9, 2009); *Chao v. Azon Employees Ret. Plan*, No. 3:06-CV-1006, 2007 WL 4287784, at \*4 (N.D.N.Y. Dec. 7, 2007); *Chao v. Zoltrix*, No. C-07-00610, 2007 WL 2990429, at \*3 (N.D. Cal. Oct. 11, 2007).

B.      This Court has Authority Under ERISA to Grant the Relief Sought by Acting Secretary in This Case.

One of the remedies expressly enumerated in ERISA is removal of a breaching fiduciary. ERISA § 409(a), 29 U.S.C. § 1109(a); *see Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) (fiduciary subject to such other equitable or remedial relief as the court may deem appropriate including removal of the fiduciary). A permanent injunction against serving as a fiduciary is also an appropriate remedy under ERISA. *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992), cert. denied, 506 U.S. 1054 (1993) (permanent injunction imposed on fiduciary who demonstrated a "fundamental misunderstanding" of ERISA). In an action brought to enforce a remedial federal statute that provides a Court with broad jurisdiction to fashion relief, an injunction freezing assets and appointing an independent fiduciary is particularly appropriate to ensure that participants suffer no additional losses due to ongoing misconduct. *Commodity Futures Trading Comm'n v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). Thus, this Court should order not only a

14

freeze Defendants' assets, but also appointing an independent fiduciary the authority to conduct an accounting of plan assets.

**II.     This Court Should Enter a Temporary Restraining Order.**

      A.      <u>Legal Standard for a Temporary Restraining Order</u>

The purpose of a temporary restraining order ("TRO") is to prevent irreparable harm to a party until a preliminary injunction hearing may be held: "If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b)." *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.,* 655 F. Supp. 2d 581, 588 (W.D. Pa. 2009), citing Fed. R. Civ. P. 65(b); *accord AT&T v. Winback and Conserve Prog. Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994). The purpose of a temporary restraining order ("TRO") is to prevent irreparable harm to a party until a preliminary injunction hearing may be held: "If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b)." *Trefelner* 655 F. Supp. 2d at 588, citing Fed. R. Civ. P. 65(b); *accord Winback and Conserve Prog. Inc.*, 42 F.3d at 1427.

When a party moves for a temporary restraining order pursuant to Rule 65(b), a court will apply the familiar legal standard applied to motions seeking preliminary injunctions. This, in considering a motion for a temporary restraining order, courts evaluate the following factors:

(1) a likelihood of success on the merits;

(2) it will suffer irreparable harm if the injunction is denied;

(3) granting preliminary relief will not result in even greater harm to the nonmoving party; and,

(4) the public interest favors such relief.

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975); *Scott v. Family Dollar Stores*, 2020 WL 7296780, at *3 (W.D.Pa., 2020). These four factors comprise a balancing test; although the moving party must normally make a showring for the first two prongs, courts ultimately must weigh all relevant facts. *Kos Pharmaceuticals*, 369 F.3d at 711.

Courts do "not require that the right to a final decision after trial be wholly without doubt; the movant need only show a reasonable probability of success." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. Jan. 30, 2017). Courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

      B.      <u>The Acting Secretary Has Met the Standard for a TRO.</u>

      *1.      The Acting Secretary Will Likely Succeed on the Merits.*

The Acting Secretary has shown a likelihood of success on the merits because the facts are egregious obviously violate ERISA's stringent requirements. ERISA § 3(21) defines "fiduciary" in broad functional terms that easily encompass Defendants RiversEdge and Palguta:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets … or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan.

29 U.S.C. § 1002(21)(A); *see Kayes v. Pacific Lumber*, 51 F.3d 1449, 1459 (9th Cir. 1995). Here, Defendants RiversEdge and Palguta exercised discretionary authority and control regarding the management and disposition of ERISA plan assets when they arbitrarily moved funds among various plans and when they embezzled plan funds. Thus, they are ERISA fiduciaries despite language in their contracts with their clients disclaiming fiduciary status.

16

As fiduciaries of ERISA-covered plans, Defendants were required to comport their actions and conduct to the strict fiduciary standards enunciated in ERISA § 404(a), 29 U.S.C. § 1104(a). Among ERISA's fiduciary duties are: the duty of loyalty, which is the duty to act solely in the interest of the plan's participants and for the exclusive purpose of providing benefits to them, ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); the duty of prudence, which requires a fiduciary to discharge his duties with the "care, skill, prudence and diligence" that a prudent person acting in a like capacity and familiar with such matters would use in similar circumstances, ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and the duty to adhere to plan documents, which requires fiduciaries to administer the plan "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). ERISA's fiduciary duties are the "highest known to law." *Couturier*, 572 F.3d at 1077. Fiduciary decisions must be made with an eye single to the interest of the participants and beneficiaries. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

RiversEdge and Palguta disloyally and imprudently misappropriated ERISA-covered retirement assets from their clients when they transferred plan assets among trust accounts owned by separate clients. They then issued fraudulent trust account statements to their clients showing that those transfers had not been made and that their trust accounts had not been raided. Defendants made these transfers to cover shortfalls in plan accounts resulting from their embezzlement of plan assets. Defendants obviously did not engage in such transfers for the benefit of participants and beneficiaries of the plans that actually owned the funds that were

intended to provide retirement security. Rather, Defendants took this money for their own benefit.

In addition to ERISA's fiduciary standards, ERISA § 406 prohibits certain transactions between a plan and a party-in-interest. 29 U.S.C. § 1106.  A party in interest to an employee benefit plan is defined to include fiduciaries (such as Defendants), a person providing services to a plan (such as Defendants). *See* ERISA § 3(14), 29 U.S.C. § 1002(14). As parties-in-interest, Defendants are forbidden by ERISA to engage in prohibited transactions. In pertinent part, ERISA § 406(a), 29 U.S.C. § 1106(a) reads:

> (a) Except as provided in § 408 (29 U.S.C. § 1108):
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (B) lending of money or other extension of credit between the plan and a party in interest; … [or]
> >
> > (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

In addition to the conflict of interest prohibited transactions listed in ERISA flatly prohibits self-dealing. It reads, in pertinent part:

> (b)    A fiduciary with respect to a plan shall not --
>
> (1)    deal with the assets of the plan in his own interest or for his own account,
>
> (2)    in his individual or any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interest are adverse to the interest of the plan or the interest of its participants or beneficiaries.

§ 406(a) and (b), 29 U.S.C. § 1106(a) and (b).

Embezzling plan assets blatantly violates ERISA's prohibited transactions provisions. Parties with control over plan assets must not steal those assets. By transferring plan assets to the

RiversEdge account at PNC, and withdrawing more than $180,000 in cash, Defendants engaged in prohibited transactions.

Defendants also violated their obligations in connection with the aftermath of their misappropriation of plan assets. The Supreme Court has consistently held that an ERISA fiduciary owes a duty of impartiality to plan participants. *See Howe v. Varity*, 516 U.S. 489, 514 (1996) (describing duty of "trustee[s] to take impartial account of the interest of all beneficiaries"). Other courts have also noted that fiduciaries owe a duty to treat all participants and beneficiaries impartially. *Summer v. State Street*, 104 F.3d 105, 108 (7th Cir. 1997) ("picking and choosing among beneficiaries [would be] in violation of the traditional duty imposed by trust law of impartiality among beneficiaries"); *see also* Restatement of Trusts (Second), § 183 (1959) ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them").

Defendants violated these duties when they transferred funds purposefully between trust accounts as needed to cover up the deficiencies in the accounts caused by their embezzlement. As a result, some ERISA plans are short of funds, while others likely are not. As fiduciaries, Defendants were required not to discriminate among plans in this way. Defendants' violations are clear and also alarming. This evidence shows that the Acting Secretary will succeed on the merits.

2. *Irreparable Harm Is Likely in the Absence of Immediate Relief.*

Injunctive relief is available "[i]f plaintiffs demonstrate that irreparable injury is likely in the absence of an injunction." *Couturier*, 572 F.3d at 1081 (internal citation omitted). Here, injury is likely absent injunctive relief. Although the Department of Justice is taking action to protect the plan assets in the MATC accounts from Palguta and RiversEdge, and also attempting

to freeze the PNC accounts, DOJ has not notified the Acting Secretary that any court has yet awarded a seizure warrant. In addition, the Acting Secretary is unaware of any injunctions that have been issued  to protect plan assets in the Schwab trust accounts. Finally, some trust accounts are underfunded, and others are overfunded because of Defendants' illegal transfers of trust assets between accounts. An immediate accounting of seventeen (17) identified plans which have had suspicious transactions is needed to identify and resolve these issues.

3.    *The Balance of the Equities Tips in Favor of Injunctive Relief.*

The balance of equities favors an award of injunctive relief for the Acting Secretary in this matter. The removal of existing plan fiduciaries and appointment of an independent fiduciary to protect plan participants and beneficiaries is squarely within the Acting Secretary's authority to enforce ERISA. *Solis v. Hutcheson*, 2012 WL 2151525, at *5–6 (D. Idaho 2012). Recognizing the public interest in protecting against future harm to ERISA plans, courts have rejected arguments that "ERISA fiduciaries and their associates must be allowed to loot a second pension plan before an injunction may be issued." *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991); *Solis v. Couturier*, 2009 WL 1748724 at *7. "Accordingly, injunctive relief is available including an injunction to prohibit a party from having further dealings with ERISA covered plans." *Tomasso*, 682 F. Supp. at 1306; accord Beck, 947 F.2d at 641. *Hutcheson*, 2012 WL 2151525, at *5–6.

Here, the harm that would likely occur without an injunction "would leave . . . participants without the benefits whose security ERISA strives above all else to protect." *Couturier*, 572 F.3d at 1081. The participants' interests in the loyal and prudent management of their pension assets far outweigh any legitimate interest that RiversEdge and Palguta may assert

20

to continued access to the funds. Participants are at significant risk of further harm unless this Court stops Defendants' abuses. Thus, the balance of the equities favors preliminary relief.

        4.      *An Injunction Is in the Public Interest.*

Defendants RiversEdge and Palguta have violated myriad provisions of ERISA, including but not limited to their duties of prudence and loyalty in ERISA § 404. They engaged in egregious self-dealing and outright theft of plan assets, in violation of the prohibited transaction and self-dealing rules in ERISA §§ 406(a) & (b). RiversEdge and Palguta treated ERISA trust funds as their personal piggy banks, transferring assets to their PNC accounts and concealing their embezzlement through fraudulent account statements. They juggled funds among ERISA plan trust accounts when necessary to make stock transactions from under-funded accounts. ERISA seeks to protect the public's confidence in the pension system, and the Acting Secretary's action furthers that interest.

        5.      *A TRO Comports with Due Process in This Case.*

Ordinarily, parties facing a motion for a temporary restraining order should be given notice and an opportunity to be heard, even if such notice is provided informally through communications such as email. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 432 (1974); Fed. R. Civ. P. 65(a)(1) and (2). Here, the Acting Secretary's counsel has contacted Defendants' counsel, Michael Comber and Tina Miller, who practice in Pittsburgh, Pennsylvania, notifying them of this lawsuit. They agreed to waive formal service of the summons and complaint.

**III.    This Court Should Order Defendants RiversEdge and Palguta to Show Cause Why This Court Should Not Enter a Preliminary Injunction.**

The Acting Secretary also moves this Court to issue an order requiring RiversEdge and Palguta to show cause why the Court should not issue a preliminary injunction to keep the terms

of the TRO in place throughout this litigation. The standards for a preliminary injunction are the same as those for a TRO. A party must show the following: "(A) they are likely to succeed on the merits of their claims, (B) they are likely to suffer irreparable harm without relief, (C) the balance of harms favors them, and (D) relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. Jan. 30, 2017). Preliminary injunctions are normally considered only after an evidentiary hearing. The Acting Secretary requests that this Court issue the TRO and then schedule an evidentiary hearing during which RiversEdge and Palguta may present any evidence that they may have as a defense to a preliminary injunction.

WHEREFORE, the Acting Secretary respectfully requests that her Motion be GRANTED.

Respectfully submitted,

**UNITED STATES DEPARTMENT OF LABOR**

Mailing Address:

Seema Nanda
Solicitor of Labor

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968
O:  215-861-5128
luby.andrea@dol.gov

Samantha N. Thomas
Acting Regional Solicitor

Usha Rengachary
ERISA Counsel

Andrea Luby
Senior Trial Attorney

*/s/ Andrea Luby*
Senior Trial Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served this 25th day of January 2024 upon counsel for Defendants at the following email addresses:

Michael Comber
mcomber@combermiller.com

Tina Miller
tmiller@combermiller.com

Jeremy P. Blumenfeld
jeremy.blumenfeld@morganlewis.com

Max Bernstein
max.bernstein@morganlewis.com

David Levine
dlevine@groom.com

George Sepsakos
gsepsakos@groom.com

*Andrea Luby*
Andrea Luby